# The Pennsylvania Railroad Company *versus* The City of Pittsburgh.   (Four Cases.)

## The Pennsylvania Company *versus* Same.

## The Citizens' Passenger Railway Company of Pittsburgh *versus* Same.

1. Under the Act of January 4th 1859 (P. L. 828), entitled "An Act to enable the city of Pittsburgh to raise additional revenue,"—which provides: " That all real estate situated in said city, owned or possessed by any railroad company, shall be, and is hereby made subject to taxation for city purposes, the same as other real estate in said city, "—the land, and the buildings and improvements thereon, situated in the city of Pittsburgh, belonging to railroad companies, are liable to taxation for city purposes, notwithstanding the said land and buildings are such as are essential to enable said railroad corporations to exercise their franchises in the operation of their railroads.

2. Similar real estate of a passenger railway company in the city of Pittsburgh is taxable under the provisions of the said Act.

3. The mode of proceeding to assess and enforce payment of such taxes adopted in this case was justified by law.

November 6th 1883.   Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett and Green, JJ.   Clark, J., absent.

Writs of error to the Court of Common Pleas No. 1 of *Allegheny county :* Of October and November Term 1883, Nos. 193, 194, 195, 196, 197, 212.

These cases were, in the court below, actions of scire facias sur municipal liens, for taxes, by the city of Pittsburgh against the Pennsylvania Railroad Company, the Pennsylvania Company operating the Pittsburgh, Fort Wayne and Chicago Railway, and the Citizens' Passenger Railway Company of Pittsburgh, respectively.   Affidavits of defence were filed in each case, and also pleas of nunquam indebitatus.   The parties, by agreement filed, waived trial by jury, and the cases were tried, in accordance with the provisions of the Act of April 22d 1874 (P. L. 109), before Stowe, P. J., whose findings of fact and conclusions of law in the several cases were as follows :

### City of Pittsburgh v. Pennsylvania Railroad Company.

Finding of facts, No. 584, March Term 1882.

The following facts appear from the evidence and admissions of the parties in the case :

The Pennsylvania Railroad Company was incorporated by

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

an Act of Assembly, approved April 13th 1846 (P. L. 312), with authority to construct a railroad, one terminus of which should be in the city of Pittsburgh ; and to purchase, hold, use and enjoy lands, tenements and hereditaments such as may be necessary or convenient for the making and constructing of the railroad, or for furnishing materials therefor, and for the accommodation of depots, offices, warehouses, machine houses, toll houses, engine and water stations, and other appropriate appurtenances, and for persons and things employed or used in or about the same (section 2).

In the year 1879 taxes for city purposes were assessed by the proper authorities of the city of Pittsburgh upon a certain property situated in the First ward of said city, and described in the lien filed February 17th 1882, as lot 660x110, Liberty street, from Water street to Third street, one large frame freight depot. This property, as the evidence discloses, is one of the terminal freight stations of the Pennsylvania Railroad Company, and is such property as is ordinarily and properly pertinent to the railroad as such, and strictly necessary for its proper operation in exercising its franchises. The property is used exclusively for railroad purposes, and was so used during the years for which the taxes in question were assessed. It was not then, and is not now, assessed as taxable for county purposes. It was acquired by the Pennsylvania Railroad Company in part by appropriation proceedings under its charter, and in part by conveyances in fee simple, and in part by a city ordinance as hereinafter explained.

The acquisition of said property for railroad purposes was expressly authorized by an Act approved February 17th 1854 (P. L. 76), and an Act approved April 21st 1854 (P. L. 453). The right of the company to lay its rails over and through the streets of the city of Pittsburgh, so as to connect with this property, was expressly granted by an ordinance of said city enacted on the 15th day of June, 1848. An alley, known as Bell's alley, and which extended from Liberty street to Exchange alley, through the middle of the property, was vacated by an ordinance of the city dated May 9th 1854, and the use of the ground occupied by said alley granted to the Pennsylvania Railroad Company, said company paying the city therefor at the same rate that they paid for adjoining property, and with a proviso that whenever the said ground should cease to be used for the purpose of a depot the same should revert to the city.

An Act of Assembly, approved January 4th 1859 (P. L. 828), entitled " An Act to enable the city of Pittsburgh to raise additional revenue," gave additional powers to the city of Pittsburgh with respect to taxation. Section 1 authorized the levy

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

and collection of a license upon pawnbrokers, and authorized the enacment of a penalty for the non-payment thereof. Section 2 authorized and empowered the levy and collection of a tax upon retailers and auctioneers, and provided that the tax so levied should be collected as other taxes are now by law collected, and should be a lien until paid upon all property owned by parties assessed, in like manner as prescribed, with reference to taxes upon real estate under then existing laws. Section 4 authorized the levy and collection of a business tax; and section 5 provides that this latter tax should be retained and deducted by cashiers, treasurers or other officers having charge of corporations upon which the tax was levied, and that upon a failure to pay the same the property of the corporation should be subject to levy and sale by any ward constable upon a warrant to be issued by the city treasurer. And provided, also, "And all taxes levied in pursuance of this Act may be recovered as debts of similar amounts are recoverable by law."

Section 3 is in these words: "That all *real estate* situated in said city owned or possessed by *any railroad company* shall be and is hereby made subject to taxation for city purposes, the same as other real estate in said city."

It is under this section that the city now claims a right to assess and recover the taxes claimed in this suit. The lien in this case filed was filed pursuant to the provisions of an Act entitled "An act in relation to cities of the second class, providing for the levy, collection and disbursement of taxes and water rents," approved the 22d day of March, 1877 (P. L. 16). This Act does not name the subjects of taxation. It provides, however, that taxes and water rents shall be payable in instalments during certain months, in the Act named, and provides also for the appointment by the city treasurer of an officer to be denominated "Collecter of Delinquent Taxes." When taxes are delinquent under the Act it becomes the duty of the city treasurer to prepare lists of such delinquent taxes and furnish the same to the collector.

The act then provides, section 9: "Upon lists aforesaid being furnished to such collector, he shall immediately thereafter proceed to collect all such delinquent taxes and water rents either out of the personal or real estate of such delinquent owner, wherever the same may be found, and for such purpose he shall be and is hereby invested with full authority to levy on and sell the personal property after the tax and water rents have become delinquent thirty days, and the real estate of any owner where the taxes or water rents remain unpaid for six months may be sold by direction of such collector.

"It shall be the duty of such collector to procure an accurate description of the real estate upon which said delinquent

taxes have been assessed if the same is not given on the assessor's books, the costs thereof to be charged against such owner not to exceed in any case one dollar, and to file liens therefor in the office of the prothonotary." . . . .

And section 11 provides : " All taxes and water rents levied for any purpose in cities of the class aforesaid, shall remain liens until fully paid and satisfied, and shall not be divested by any judicial sale, except to the extent to which distribution shall be made out of the proceeds of said sale."

This Act has a general repealing clause of all Acts or parts of Acts in conflict with it.

An Act approved the 28th day of March, 1872 (P. L. 606), entitled " An Act giving power to the councils of the city of Pittsburgh to equalize the valuation of the taxable property within the city for city purposes," provides (inter alia), section 2, " That the said councils of the city of Pittsburgh shall take for city purposes the aggregate valuation of the taxable property within said city as assessed for county purposes, and in altering, revising or equalizing said valuation for city purposes, they shall not increase the aggregate valuation beyond the aggregate amount assessed for county purposes within the city.

An Act approved the 5th day of May, 1876 (P. L. 124), entitled " An Act providing for the classification of real estate for the purposes of taxation and for the appointment of assessors in cities of the second class" provides in its first section, for the election of a Board of Assessors ; and in its second section provides as follows : " That said Board of Assessors shall make an assessment of all subjects of taxation now by law or hereafter made subject to taxation for city purposes, and shall take as the basis of such assessment, the assessments as returned by the ward assessor of the several wards of said city to the County Commissioners, a copy of which shall be furnished to said board by the said County Commissioners of the county in which said city is situated, and shall have power to revise, equalize or alter such assessments by increasing or reducing the valuations, either in individual cases or by wards or parts of wards, to add to such lists of assessments any subject of taxation subject to taxation as aforesaid omitted therefrom, and attach a valuation thereto."

It is contended upon the part of the railroad company that taxes claimed in these proceedings are not collectible for the following reasons :

1st. Because the term " real estate " in the classification of the tax laws has no application to real property which is indispensable to a railroad as such and constitutes part of its franchise.

2d. Because the only proper subjects of assessment for the purposes of taxation by the city of Pittsburgh are such as are

the subjects of assessment and taxation for county purposes, and,

3d. Because the remedy provided for the collection of these taxes is by a proceeding in rem, and that the property described in the liens cannot be sold or divested of its public use, and that the statutory remedy is exclusive.

### Same v. Same.

FINDING OF FACTS, No. 587, March Term 1882.

In the year 1881 taxes for city purposes were assessed by the proper authorities of the city of Pittsburgh upon a certain property situated in the Third ward of the city of Pittsburgh, and described in the lien filed Feb. 17th 1882, as lot 36x60, Cherry alley, corner of Oak alley, two two-story brick dwellings, one three-story brick smoke-house. Lot 33x74, Oak alley, corner of Railroad alley; one three-story building. Lot 31.3½ inches, Liberty street, 79.9½ inches, Cherry alley, averaging 98 feet deep to Railroad alley, one three story brick hotel building. Lot 250x120, Grant street from Seventh avenue to Plum alley. Lot 250x120, Grant street to private alley between Seventh avenue and Liberty street. Triangular lot 158, averaging 65, Grant street and Liberty street.

Upon all of this property, except the last three items named, the Pennsylvania Railroad Co. paid taxes in full as claimed by the city. The last three items, as the evidence discloses, constitute together one of the freight stations of the Pennsylvania Railroad Co., and constitute a property such as is ordinarily and properly pertinent to the railroad as such, and strictly necessary for its proper operation in exercising its franchises; it is used exclusively for railroad purposes, and was so used during the years for which the taxes in question were assessed. It was not then and is not now assessed as taxable for county purposes.

The right of the company to lay its rails over and through the streets of the city of Pittsburgh, so as to connect with this property is expressly granted and recognized by several ordinances of said city.

An Act of Assembly, approved January 4th 1859 (P. L. 828), entitled " An Act to enable the city of Pittsburgh to raise additional revenue," gave additional powers to the city of Pittsburgh with respect to taxation, etc., etc., as in finding at No. 584, March Term 1882, supra.

### Same v. Same.

FINDING OF FACTS, No. 588, March Term 1882.

In the year 1880, taxes for city purposes were assessed by the proper authorities of the city of Pittsburgh upon a certain property situated in the Fourth ward of said city, and described

in the lien filed February 17th 1882, as lot 30x120, Liberty, between Third and Fourth streets, two-story brick dwelling; lot 140x110, Liberty street, corner of Eleventh street, less right of way, Slate office. Lot 60x68, Liberty street, corner of Third, one two-story brick office building.

Upon item in the lien filed described as lot 140x110, Liberty street, corner of Eleventh street, less right of way, Slate office, the Pennsylvania Railroad Company paid taxes as assessed by the city. The remainder of the property in said lien described constitutes the freight offices of the company, used in connected with Duquesne Freight Depot, and is such property as is ordinarily and properly pertinent to the railroad as such, and strictly necessary for its proper operation in exercising its franchises. The property is used exclusively for railroad purposes, and was so used during the years for which the taxes in question were assessed. It was not then, and is not now, assessed as taxable for county purposes.

An Act of Assembly, approved January 4th 1859 (P. L. 828), entitled "An Act to enable the city of Pittsburgh to raise additional revenue," gave additional powers to the city of Pittsburgh with respect to taxation, &c., &c., as in finding at No. 584, March Term 1882, supra.

### Same v. Same.

### FINDING OF FACTS, No. 593, March Term 1882.

In the year 1880, taxes for city purposes were assessed by the proper authorities of the city of Pittsburgh, upon a certain property situated in the Ninth ward of said city, and described in the lien filed February 17th 1882, as lot averaging 330x260, Liberty street to Faber street, from Washington street to Elm street, less right of way of Pittsburgh, Ft. Wayne & Chicago Railway, and Pittsburgh, Cincinnati & St. Louis Railway, one small freight depot, one round-house for twenty engines, one one-story machine and blacksmith shop. Lot 1702x210, Liberty street to south side of Quarry, beginning at Elm street, including Elm, thence eastwardly to ward line at Fifteenth street, less right of way of Pennsylvania Railroad, one two-story brick depot and shed, one two-story brick gas house, two coal yards, machinery. Lot 332x200 Quarry street south side to alley from Elm street to Twelfth street. Lot 325, averaging 87, Quarry street, south side, between Twelfth and Thirteenth streets. Lot 865, averaging 203, Quarry street, south side, between Thirteenth and Fifteenth streets. Lot 50x50, Washington street.

On the items of property described in the lien, two coal yards and lot 50x50, Washington street, the Pennsylvania Railroad Company paid taxes as assessed by the city. The

remaining property described in the lien, as the evidence discloses, is covered entirely with tracks, passenger station, roundhouses and ways of approach to the passenger station, and buildings used in connection with the railroad. There is included therein the Union Station, which is the Pennsylvania Railroad Company's terminal passenger station in the city of Pittsburgh, used also by a number of western lines centering in said city, and also the Pittsburgh yard, used by all these companies; according to the evidence, a railroad train comes or goes from this station on an average of each three minutes of every twenty-four hours, and not less than 17,000 persons daily make use of said station. A very large portion of the property described is made up of certain streets of the city of Pittsburgh, which were surrendered to the Pennsylvania Railroad Company, by authority of Acts of the legislature, and ordinances of the city, for railroad purposes. The entire property is such as is ordinarily and properly pertinent to the railroad as such, and strictly necessary for its proper operation in exercising its franchises. It is used exclusively for railroad purposes, and was so used during the years for which the taxes in question were assessed. It was not then, and is not now, assessed as taxable for county purposes. It was acquired by the Pennsylvania Railroad Company in part by appropriation proceedings under its charter, and in part by conveyances in fee simple, and in part by virtue of legislation, state and municipal, authorizing the vacation of certain streets as before stated.

The acquisition of said property by the Pennsylvania Railroad Company for railroad purposes, was authorized by legislation as follows:

1. "An Act to authorize the Pennsylvania Railroad Company to purchase and hold certain real estate in the city of Pittsburgh," approved February 7th 1856, P. L. 33.

2. "An Act relative to the removal of the tracks of the Pennsylvania Railroad Company from a portion of Liberty street, in the city of Pittsburgh," approved April 5th 1860, P. L. 667.

3. "An Act extending the term for the removal of the tracks of the Pennsylvania Railroad Company from a portion of Liberty street, in the city of Pittsburgh," approved April 1st 1863, P. L. 194.

4. "An Act relative to taking certain ground in the city of Pittsburgh by the Pennsylvania Railroad Company," approved April 18th 1863, P. L. 512.

5. "A further supplement to an Act relative to the removal of the tracks of the Pennsylvania Railroad Company from a portion of Liberty street in the city of Pittsburgh, approved April 5th 1860," approved April 20th 1864, P. L. 514.

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

6. " A further supplement to an Act relative to the removal of the tracks of the Pennsylvania Railroad Company from a portion of Liberty street, in the city of Pittsburgh, approved April 5th 1860," approved March 21st 1865, P. L. 466.

7. "An ordinance granting certain privileges to the Pennsylvania Railroad Company," ordained June 15th 1848.

8. "An ordinance changing the grade of Liberty street, between Wayne and O'Hara streets," ordained August 19th 1858.

9. "An ordinance to enable the Pennsylvania Railroad Company to remove its tracks from a portion of Liberty street, in the city of Pittsburgh," ordained December 12th 1861.

A large number of streets, public alleys, and passage ways of the city of Pittsburgh, herein before referred to, were vacated pursuant to the foregoing legislation and are included in the property described in the lien, all of which are now used exclusively for railroad purposes, and are necessary to the operation of the company in the exercise of its franchise.

An Act of Assembly, approved January 4th 1859, P. L. 828, entitled "An Act to enable the city of Pittsburgh to raise additional revenue," gave additional power to the city of Pittsburgh, with respect to taxation, &c., &c., as in finding at No. 584, March Term 1882, supra.

## Same v. The Pennsylvania Company, operating the Pittsburgh, Fort Wayne and Chicago Railway.

FINDING OF FACTS, No. 589, March Term 1882.

The following facts appear from the evidence and admissions of the parties in the case:

The Pennsylvania Company was incorporated by an Act of Assembly, approved April 7th 1870 (P. L. 1025), with power (inter alia) to lease, manage and operate railroads. The Pittsburgh, Fort Wayne & Chicago Railway Company, a corporation duly existing under the laws of Pennsylvania, by appropriate proceedings, leased its entire railway property and appurtenances to the said Pennsylvania Company, and the Pittsburgh, Fort Wayne & Chicago Railway Company is now being operated and managed by the said Pennsylvania Company under said lease.

Said Pittsburgh, Fort Wayne & Chicago Railway Company has authority (inter alia) to construct a railroad, one terminus of which should be in the city of Pittsburgh, and to purchase, hold, use and enjoy lands, tenements and hereditaments necessary or convenient for the making and constructing of the railroad and the operation of the same.

In the year 1880 taxes for city purposes were assessed by

8 OUTERBRIDGE.—34

the proper authorities of the city of Pittsburgh, upon certain property of said Pittsburgh, Fort Wayne & Chicago Railway Company, now in the use and occupation of the Pennsylvania Company, situate in the Fourth ward of said city, and described in the lien filed February 17th 1882, as follows:

Lot 360, averaging 596, Penn avenue, through to the river, corner of Tenth street, less right of way, five-story brick office building, three-story brick building, two small freight depots, one large freight depot shed.

Upon so much of this property as is not in actual use for railroad purposes the defendant company paid taxes as assessed by the city. That portion of the property upon which taxes were not paid is, as the evidence discloses, the terminal freight station of the Pittsburgh, Fort Wayne & Chicago Railway Company, in the city of Pittsburgh and its general offices used in connection with its railroad business, and is such property as is ordinarily and properly pertinent to the railroad as such, and strictly necessary for its proper operation in exercising its franchise. The property is used exclusively for railroad purposes, and was so used during the years for which the taxes in question were assessed. It was not then and is not now assessed as taxable for county purposes.

An Act of Assembly, approved January 4th 1859 (P. L. 828), entitled " An Act to enable the city of Pittsburgh to raise additional revenue," gave additional powers to the city of Pittsburgh with respect to taxation. Section 1 authorized the levy and collection of a license upon pawnbrokers; and authorized the enactment of a penalty for the non-payment thereof. Section 2 authorized and empowered the levy and collection of a tax upon retailers and auctioneers, and provided that the tax so levied should be collected as other taxes are now by law collected, and should be a lien until paid upon all property owned by parties assessed in like manner as prescribed with reference to taxes upon real estate under then existing laws. Section 4 authorized the levy and collection of a business tax; and section 5 provides that this latter tax should be retained and deducted by cashiers, treasurers or other officers having charge of corporations upon which the tax was levied, and that upon a failure to pay the same the property of the corporation should be subject to levy and sale by any ward constable upon a warrant to be issued by the city treasurer. And provided, also, " And all taxes levied in pursuance of this Act may be recovered as debts of similar amounts are recoverable by law."

Section 3 is in these words: " That all real estate situated in said city owned or possessed by any railroad company shall be and is hereby made subject to taxation for city purposes

the same as other real estate in said city," &c., &c., as in finding at No. 584, March Term 1882, supra.

### OPINION OF THE COURT, IN ALL OF THE FOREGOING CASES.

There are several principles of law involved in this controversy so well settled that it is needless to do more than state them here.

1st. Under the constitution of this state the taxing power is vested absolutely in the legislature, and is limited only by its discretion.

2d. To carry out the purposes of municipal governments the legislature may vest in them powers of taxation.

3d. The legislature may tax railroad property either for state or municipal purposes, except where in special cases it would violate the charter of some particular company,

4th. The law is settled that the words " real estate " in the general tax law of the state do not include or make liable to taxation the real estate of a railroad company, such as road-bed, depots, machine shops, and other land necessary for the operation of the road.

It is not alleged here that the charter of the defendant is such as exempts it from the taxing power of the Commonwealth. And the question upon which the whole matter turns is the proper construction of the Act of Janury 4th 1859.

What then did the legislature mean when it passed the Act in question, and in terms declared " that all real estate situate in said city (Pittsburgh), owned or possessed by any railroad company, shall be and is hereby made subject to taxation for city purposes, the same as other real estate in said city ?"

At first view the intention would seem to be too apparent to admit of doubt. The language is clear and explicit. Its ordinary meaning is clear and unquestionable. Is there anything in law as it existed prior to the Act, or at the time it was passed, which should cause a different interpretation to be given to it ? I have failed to see any. Indeed, the natural signification of the terms of the Act are strongly intensified by the law as distinctly ruled by the Supreme Court and generally understood prior to its passage.

Under the words " real estate " in the general law, property such as here involved, could not be taxed for city or county purposes. All other real estate than that owned and used by railroad companies, for strictly railroad purposes, was liable to such taxation. If the construction urged by defendant is correct that statute was useless. If it gave the city no right to tax railroad property, before exempt, why was it enacted ? To so hold would imply either great ignorance or dishonesty in the legislature. This we can not do. We must give the Act the same

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

construction that applies to all others standing in like position. To my mind it is clear that the legislature meant by the Act in question to subject the real estate of railroad companies, previously exempt, to taxation for municipal purposes, and that all the real estate assessed by the plaintiff is subject to the tax imposed.

I am also of opinion that the other objections raised by defendant, as to regularity of assessment and form of proceeding, should be overruled, and that plaintiff is entitled to judgment in this case for the amount claimed.

July 20th 1883, the foregoing decision ordered to be filed, and that judgment be entered thereon by the prothonotary in favor of plaintiff for $1,834.16, unless exceptions are filed thereto within thirty days after notice hereof, said notice to be given by the prothonotary to the parties or their attorneys forthwith.

EXCEPTIONS TO THE DECISION OF THE COURT IN EACH OF THE FORE-
GOING CASES.

1st. The court erred in deciding that the term " real estate " in the Act of the 4th day of January 1859, has any application to the property described in the lien in this case filed, or that said property is real estate within the meaning of that term as used in said Act.

2d. The court erred in deciding that such portion of the property described in the lien in this case filed, as does not belong to the defendant company in fee simple, is within the purview of said Act of the 4th day of January 1859.

3d. The court erred in not holding that it was beyond the power of the assessing officers of the plaintiff city to include as asssessable the property described in the lien in this case filed.

4th. The court erred in not holding that such portions of the property described in the lien in this case filed, as do not belong to the defendant company in fee simple, were not the subject of assessment for the purposes of taxation.

5th. The court erred in not holding that the property described in the lien in this case filed, was exempt from any proceeding such as this—that is to say, the court erred in not holding that said property was exempt from process in rem.

6th. The court erred in deciding that the defendant company's property, described in the lien filed, is subject to taxation by the plaintiff for city purposes.

[Pennsylvania R. R. Co. v. Pittsburgh.]

## City of Pittsburgh v. Citizens' Passenger Railway Company of Pittsburgh.

### FINDINGS OF FACT.

From the evidence and admissions of the parties, the following facts are found:

1. The lien was filed by the collector of delinquent taxes of the city of Pittsburgh under the provisions of an Act entitled "An Act in relation to cities of the second class, providing for the levy, collection and disbursement of taxes and water rents," approved March 22d 1877, P. L. 16, for taxes levied upon a lot of ground situated on the north side of Butler street, in the city of Pittsburgh, between Forty-first and Forty-second streets, fronting on Butler street 125 feet, and extending northwardly, the same width, 150 feet; and having a large brick stable erected thereon.

2. The taxes claimed were assessed for the year 1879, and amounted to the sum of $649.08; the said real estate being taxed the same as other real estate in said city.

3. The property was assessed by the proper city authorities, under the provisions of an Act of Assembly approved January 4th 1859, P. L. p. 828, entitled "An Act to enable the City of Pittsburgh to raise additional revenue," the provisions of which were as follows: Section 1 authorizing the levy and collection of a license upon pawnbrokers, and the imposition of a penalty for non-payment thereof. Section 2 authorizing the levy and collection of a tax upon retailers of liquors and auctioneers, and provided that the same should be collected as other city taxes, and to be a lien upon all property owned by parties assessed in like manner as prescribed with reference to taxes upon real estate under then existing laws. Section 4 authorizing the levy and collection of taxes upon business of forwarding and commission merchants, brokers, banks, insurance companies, &c. Section 5 provides that said tax shall be retained by cashiers, treasurers, and other officers of corporations, and upon failure to pay the same, the property of the corporation shall be subject to levy and sale by any ward constable, upon a warrant to be issued by the City Treasurer; and, further, that all taxes levied in pursuance of this act may be recovered as debts of similar amounts are recovered by law. Section 3 is in these words: "That all real estate situated in said city owned or possessed by any railroad company shall be, and is hereby made, subject to taxation for city purposes, the same as other real estate in said city."

The provisions of the Act of March 22d 1877, under which the lien was filed, are as follows: Sections 1 to 6, inclusive, provide the mode of assessing taxes and the time of payment:

The 7th section authorizes the appointment, by the City Treasurer, of a Collector of Delinquent Taxes. Section 8 directs the treasurer to prepare lists of delinquent taxes, and place them in the hands of the collector. Section 9 provides as follows : "Upon the lists aforesaid being furnished to such collector, he shall immediately thereafter proceed to collect all such delinquent taxes either out of the personal or real estate of such delinquent owner, wherever the same may be found ; and for such purposes he shall be and is hereby invested with full authority to levy on and sell the personal property after the taxes or water rents have become delinquent thirty days; and the real estate of any owner, when the taxes or water rents remain unpaid for six months, may be sold by direction of such collector. It shall be the duty of such collector to procure an accurate description of the real estate upon which said delinquent taxes have been assessed, if the same is not given on the Assessor's books, the cost thereof to be charged against such owner, not to exceed in any case one dollar, and to file liens therefor in the office of the Prothonotary." Section 10 provides for monthly returns of collections made. Section 11 is as follows : "All taxes and water rents levied for any purpose in cities of the class aforesaid shall remain liens until fully paid and satisfied, and shall not be divested by any judicial sale, except to the extent to which distribution shall be made out of the proceeds of such sale." Section 12 provides that all taxes shall be liens upon real estate whether the real owner is named or not, and also provides for redemption by owner within one year after sale. Section 13 provides that lists of unseated lands be advertised previous to entry in the office of the prothonotary. Sections 14 and 15 relate to procuring descriptions of property, and section 16 is a general repealing clause.

This Act does not specify the subjects of taxation.

4. The publication of delinquent taxes was made previous to filing liens, as required by the Act and the supplement thereto, approved March 15th 1878, P. L. p. 7.

5. The Act of March 30th 1860, P. L. 364, section 3, provides that councils, in levying taxes, shall be authorized to adjust the rates of taxation upon the different subjects now liable or that may hereafter be liable to taxation for city purposes, without regard to limitations in former Acts.

By Act of Assembly entitled "An Act giving power to councils of the City of Pittsburgh to equalize the valuation of the taxable property within the City of Pittsburgh for city purposes," approved March 28th 1872, P. L. 606, it is provided [section 2] : "That the said councils of the City of Pittsburgh shall take, for city purposes, the aggregate valuation of the taxable property within said city as assessed for county purposes,

and in altering, revising, or equalizing said valuation for city purposes, they shall not increase the aggregate amount assessed for county purposes within the city." And by an Act entitled "An Act providing for the classification of real estate for purposes of taxation, and for the appointment of assessors in cities of the second class," approved May 5th 1876, P. L. 124, the councils were authorized to appoint assessors; and by section 2 it was provided: "That said board of assessors shall make an assessment of all the subjects of taxation now by law, or hereafter made, subject to taxation for city purposes, and shall take, as the basis of such assessments, the assessments as returned, by the ward assessors of the several wards of the city, to the County Commissioners of the county in which said city is situated; and shall have power to revise, equalize, or alter such assessments by increasing or reducing valuations, either in individual cases or by wards or parts of wards, to add to such lists of assessment any subject of taxation subject to taxation as aforesaid omitted therefrom, and attach a valuation thereto."

6. The property against which the lien is filed in this case has not been assessed for county purposes. The Citizens' Passenger Railway Company, the defendant, was incorporated by an Act of Assembly, approved the 22d day of March 1859, P. L. 203, with power to lay out and construct and operate a railway from the intersection of Fifth and Liberty streets, and along Penn avenue, Greensburg Pike, and Butler street, in Borough of Lawrenceville, and the Lawrenceville and Sharpsburg Turnpike, to Sharpsburg, and with the right to purchase, take, and hold all such real and personal property as may be necessary and convenient to enable them to carry on the traffic of their said road. Section 9 is as follows: "The said railway company shall not be permitted to use and occupy any of the streets of the said city for the purposes of their railway, until the consent of the city councils is first thereto had, by ordinance duly passed; nor shall the said company at any time alter or change the grade or line of any street without the consent of councils first had and obtained; and the said company shall keep so much of the streets of said city as may be used and occupied by them in perpetual good repair, from curb to curb, at the proper expense and charge of the said company. Provided, further, that the said company, for and during the first five years after they shall commence running cars upon said road, shall pay into the city treasury, for the use of the city, the sum of twenty (20) dollars per year for each car run over the said road; and for and during the five years next ensuing, the sum of thirty (30) dollars per year for each car, as aforesaid; and from thence, thereafter, the sum of forty dollars per year for each car run over said road; and also, for

the first five years after they commence running cars upon said road, the said company shall pay into the city treasury, for the use of said city, three per cent. of the dividends or net profits of said company; and from thence, and thereafter, the said company shall pay into said treasury, for use of said city, five per cent. of the dividends or net profits of said company." Section 10 provided that they should not occupy any street or road of the borough of Lawrenceville, or of any incorporated company, without the consent of said corporation, and upon failure to agree, then upon terms to be fixed by court.

7. The consent of all the authorities was duly obtained except the borough of Lawrenceville, as to which a decree was made by the court of Quarter Sessions of Allegheny county, at March session, 1859 No. 11.

The consent of the city of Pittsburgh was given by ordinance of April 14th 1859. Among the conditions are the following : (1.) To pay into the city treasury, for the use of the city, within one month after the cars commence running on said road, and at the same date annually, the sum due said city prescribed in section 9 of said Act of Assembly, for each car run over said road, viz., twenty dollars per annum for each car for the first five years from the date of the first payment ; thirty dollars per annum for each car for the next five years thence next ensuing ; and forty dollars per annum for each car thereafter run over said road ; but this shall not be held to apply to cars used on extraordinary occasions, such as holidays and fair days, or to cars reserved for use in case of accident or damage to others ; and the cars shall be numbered as drays and carriages are now numbered under the ordinance regulating licenses on such vehicles. (3.) To pay into the city treasury, for the use of the city, on the third Monday in January and July, in each year, for the first five years after they commence running cars upon said road, three per cent. of the net profits of said company ; and thence, thereafter, upon the same days in each year, five per cent. upon the net profits of said company. (5.) To keep that portion of the streets through which the said road may pass in good repair, from curb to curb, subject to the directions of the recording regulator, with privilege to appeal, in case of any disagreement with said regulator, to the committee on streets, whose decision shall be final ; and any failure to comply with any of the foregoing conditions shall be held to work as a revocation of the consent and privileges granted by this ordinance.

8. The railway was constructed in pursuance of the authority granted by the Act of Assembly, and ordinance, decree, and agreements aforesaid, and has been since operated under them.

[Pennsylvania R. R. Co. v. Pittsburgh.]

9. The charter of the Citizens' Passenger Railway Company was the first granted for a road within the city of Pittsburgh, and all other charters subsequently granted contained similar provisions for taxes upon cars and dividends on net earnings, and repairs of streets.

The property, upon which the taxes claimed in this case were assessed, was purchased and is now owned by the defendant corporation in fee simple ; is used wholly and solely for the purpose of stabling horses of said company, and is indispensable to the operation of said railway and the exercise of the public franchise granted to said company by its charter.

#### POINTS SUBMITTED IN WRITING.

Counsel for defendant asks the court to find, as matter of law :

1st. That the word " real estate," as used in laws imposing taxation, does not include real property owned by corporations, and used by them in, and necessary for, the exercise of their corporate franchises; and therefore the Act of January 4th 1859, under which the city of Pittsburgh claimed the right to impose tax upon the property against which the lien in this case was filed, did not authorize the imposition of said tax.

2d. That the word " railroad," in the Act of January 4th 1859, did not include passenger railways, the construction of which was subsequently authorized, and upon which special taxes were imposed for city purposes.

3d. That the Acts of March 28th 1872, P. L. 606, and May 5th 1876, P. L. 124, limited the right of taxation for city purposes to property liable to assessment for county purposes ; and it appearing that the property against which the lien in this case was filed was not assessed for county purposes, and it not appearing that it was by law assessed for county purposes, the authorities of the city of Pittsburgh were not authorized to make the assessment of taxes now claimed.

4th. That the property against which the lien in this case was filed, being necessary for the exercise of the franchises of the defendant corporation, cannot be sold upon a judgment against it ; and the proceeding in this case being in rem, the plaintiff cannot recover in this suit.

#### OPINION OF THE COURT.

The views expressed in city of Pittsburgh v. Pennsylvania R. R. Co., No. 584, March Term 1883, control this case, unless the charter of defendant, or some other special circumstance, will withdraw it from the effect of the conclusions there arrived at.

There are some apparent differences in the status of the two

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

cases.    The most obvious are, that defendant is incorporated under the name of "railway" company.    It was not in existence at the date of the Act under which plaintiff claims the right to tax, and it was, and is now, compelled to pay a perpetual tax to the city for the privilege of using the streets, and also a yearly tax on dividends.    Will any or all of these justify the conclusion that the Act does not comprehend the defendant? We think not.    While there is a popular understanding that the expression "passenger railways" does not mean the great lines of road operated by steam power, yet it by no means follows that the term "railroad" does not properly include all passenger railways, for purposes of taxation.    A railway is essentially a railroad.    They mean the same thing, and are used indiscriminately in reference to our great inter-state lines.    We have the Penn'a Railroad Co., and the Pittsburgh, F. W. & C. Railway Co.    Nothing in defendant's charter, so far as has been made to appear, will justify me in saying that the term railroad in the Act does not include passenger railways.

But it is very strenuously urged that the defendant should not be held for all within the Act, because it is compelled, by other Acts, and ordinances of the city, to pay a tax to the city for the use of its franchises; and that to enforce this claim, would subject defendant to double taxation, and be manifestly unjust.    It is true that courts will always seek to avoid such interpretation of a statute as would work injustice or oppression, or as would be in contravention to the general policy of the state; and, in a doubtful case, such considerations are entitled to great weight.    But where the statute is unambiguous, and nothing appears showing that the intent of the legislature was different from that indicated by the terms of the Act itself, it is our duty to give it effect, however unjust and oppressive it may be.    The remedy is with the legislature, not with the courts.    But it does not strike us that the complaint of double taxation is well founded in this case.    A tax imposed upon the real estate of a railroad company used for stables is a very different thing from a tax imposed upon it for the use of the public highways for railway purposes.

Upon the whole, we can discover no sufficient reason for making a distinction between this and the case of the railroad company, and are therefore of opinion that defendant is liable to pay the taxes involved in this suit.

The points presented by defendant are answered in the foregoing opinion, and are now specifically refused.

And now, July 21st 1883, the foregoing decision of the court directed to be filed in the office of prothonotary, and ordered that judgment be entered thereon by the prothonotary in favor of plaintiff, and against defendant, for the amount of

[Pennsylvania R. R. Co. v. Pittsburgh.]

its claim, viz., $693.99, unless exceptions are filed thereto within thirty days after notice hereof; said notice to be given by the prothonotary to the parties, or their attorneys, forthwith.

### EXCEPTIONS TO THE FINDINGS OF THE COURT.

The court erred in not finding, as matter of law:

1st.   That the word " real estate," as used in laws imposing taxation, does not include real property owned by corporations, and used by them in, and necesssary for, the exercise of their corporate franchise ; and therefore, the act of January 4th 1859, under which the city of Pittsburgh claimed the right to impose tax upon the property against which the lien in this case was filed, did not authorize the imposition of said tax.

2d.  That the word "railroad," in the Act of January 4th 1859, did not include passenger railways, the construction of which were subsequently authorized, and upon which special taxes were imposed for city purposes.

3d.  That the Acts of March 28th 1872, P. L. 606, and May 5th 1876, P. L. 124, limited the right of taxation for city purposes to property liable to assessment for county purposes; and it appearing that the property against which the lien in this case was filed was not assessed for county purposes, and it not appearing that it was by law assessed for county purposes, the authorities of the city of Pittsburgh were not authorized to make the assessment for taxes now claimed.

4th. That the property against which the lien in this case was filed, being necessary for the exercise of the franchises of the defendant corporation, cannot be sold upon a judgment against it ; and the proceeding in this case being in rem, the plaintiff cannot recover in this suit.

The court subsequently entered final orders, dismissing the exceptions in all the said cases, and entering final judgment for the plaintiff in each case.   The defendants thereupon took separate writs of error in each case, assigning for error, respectively, the action of the court in dismissing the said several exceptions, and in entering judgment in each case for the plaintiff.

*Hampton & Dalzell*, for the Pennsylvania Railroad Company and the Pennsylvania Company, plaintiffs in error.

*Slagle & Wiley*, for the Citizens' Passenger Railway Co., plaintiffs in error.

*D. T. Watson* and *W. C. Moreland* (*Thomas S. Bigelow* with them), for the defendant in error.

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

Chief Justice MERCUR delivered the opinion of the court, January 7th 1884.

These six cases were argued together. They present substantially the same question. The contention is, whether taxes, for city purposes, may lawfully be assessed, by the city of Pittsburgh on certain property situate therein, owned by these corporations?

The property of the railroad companies consists of freight stations, offices and depots, round-house, machine shops, passenger stations and ground covered by tracks, and used as ways of approach to the stations and buildings used in connection with the railroads : and the property of the Passenger Railway Company is occupied for the stabling of horses of the company. It is found as a fact in each case, that the property is such as is ordinarily and properly pertinent to the several railroads, and to the railway, as such, and is strictly necessary for their proper operation in exercising their several franchises, that the property is used exclusively for such purposes, and was so used during the years for which the taxes in question were assessed, and that the property was not then or now assessed as taxable for county purposes.

It is conceded, under the legislation existing prior to the Act of January 4th 1859, P. L. 828, that this property would not be liable to taxation as real estate. Its exemption from such taxation was settled by a long line of cases, among which are : Ridge Turnpike Company *v.* Stoever, 6 W. & S. 378 ; Lehigh Coal & Navigation Company *v.* Northampton County, 8 Id. 337 ; Railroad *v.* Berks County, 6 Barr 70 ; Navigation Company *v.* Same, 1 Jones 202 ; Wayne County *v.* Del. & Hud. Canal Company, 3 Harris 351 ; N. Y. & Erie Railroad Co. *v.* Sabin, 2 Casey 242 ; West Chester Gas Company *v.* The County of Chester, 6 Id. 232 ; Carbon Iron Company *v.* Carbon County, 3 Wright 251.

While the language of previous Acts, subjecting real estate to taxation, was broad enough in its general terms to include the public works of a corporation, used as such, with the necessary appurtenances, yet the courts held they were exempt from taxation as land, but were subject to it in another form : Coatesville Gas Co. *v.* County of Chester, 1 Out. 476. The cases rested on the presumed intention of the legislature, in the absence of express declaration, not to subject such property to taxation as land. The power, however, of the legislature to make it subject to taxation as real estate, cannot be successfully denied. The taxing power in this Commonwealth is vested absolutely in the legislature, and when not prohibited by the Constitution, it is limited in the exercise of that power by its discretion only. It may tax every species of property perma-

nently within the limits of this state, not exempt by the Constitution thereof, or by the Constitution and laws of the United States. Whatever power it possesses it may delegate to a municipal government, to be legitimately exercised within its corporate limits : N. Y. & Erie R. R. Co. v. Sabin, supra ; Pitts., Ft. Wayne & Chicago R. R. v. Commonwealth, 16 P. F. Smith 74 ; In re Washington Avenue, 19 Id. 363 ; Butler's Appeal, 23 Id. 451. The fact that it may authorize the laying of a municipal tax which may be burdensome in its character, does not make it unconstitutional : Kelly v. Pittsburgh, 4 Norris 170 ; S. C., 14 Otto 78.

Legislative power to tax the property in question as real estate being clear, it remains only to consider whether the legislature has authorized it to be so taxed. This depends on the effect to be given to the Act of 4th January 1859. It is entitled " An Act to enable the city of Pittsburgh to raise additional revenue." A very natural and effective way to raise more revenue, was to impose taxes on property which at that time was exempt from such taxation. Therefore section 3 of the Act declares " that all real estate situated in said city, owned or possessed by any railroad company shall be and is hereby made subject to taxation for city purposes, the same as other real estate in said city."

This Act contains no obscure language. It expresses no doubtful meaning. It speaks so clearly that it cannot be misunderstood. Its purpose is distinctly stated in the title. To that end the enacting clause provides that "all real estate" in the city belonging to any railroad company shall be "subject to taxation for city purposes the same as other real estate in the city." Other real estate in the city was then taxable for city purposes. Up to that time all the real estate of any railroad company was not subject to taxation the same as other real estate for the purpose named. Thenceforth, for that purpose, no distinction was to be made between the real estate of a railroad corporation, and that owned by any individual. The lawmakers are presumed to have known that this property was then exempt from such taxation. All other real estate of any railroad company outside of that in question was already subject to this form of taxation. Unless the intention of the Act was to bring this property within the taxing power of the city, this section has no meaning. We cannot impute to the legislature the folly of assuming that it did not intend to produce a practical result for the benefit of the city. The fact that such property had theretofore been held to be an incident to the corporate franchises of the railroad companies, matters not. It nevertheless was real estate. Land purchased and owned by copartners as partnership property, may, for many purposes, be

considered personal property, yet for all purposes of taxation, it is real estate. The fact that this property was held and used by the railroad companies to facilitate the working of their roads, did not destroy its character as real estate.

. It is claimed that the property is exempt from taxation as real estate, under the authority of Wayne County *v.* Delaware and Hudson Canal Co., supra, notwithstanding the Act of 1859. At first view that case might appear to sustain this claim. A careful examination of the case, however, leads to a different conclusion. The Act authorizing the canal company in that case, to improve the navigation of the river, declared that "the property of said company, whether real or personal, within this state, shall at all times be liable for its debts and subject to taxation in like manner as similar property held by an individual or by a corporation now is or may be." The preamble to the Act recites the fact that the canal company had been incorporated by the legislature of the state of New York: and by the Act of our legislature of 1st April 1825, P. L. 141, the company was authorized "to purchase and hold any quantity of lands situate at any place within ten miles of the waters of the Lackawaxen, not exceeding five thousand acres." Undoubtedly the purpose of the clause first quoted was to make all the property of the company within this state liable for its debts and subject to taxation. How liable, and how subject? It did not attempt to create any new forms of proceeding: but to preserve and apply the forms of law then applicable to each kind of property. Its property was to be liable for its debts and subject to taxation, " as similar property held by an individual or by a corporation." That is, so much of its property as was subject to sale on execution or to taxation as individual property might be so sold and taxed ; but such other property as it held and used as essentially necessary for the enjoyment of its franchise was to be held liable for its debts and subject to taxation in like manner as similar property held by a corporation—that is, by other corporations. The exemption of such property of a corporation from taxation as real estate, was then well recognized law. The Act does not contain anything indicating an intention to change the manner of its taxation. The court therefore ruled that case on the general principle recognized in other cases where the charters did not contain such language. It is not applicable to the present case.

We discover nothing to exempt the Passenger Railway Company from the operation of the Act of 1859. Such a company is within the intent and spirit of the Act, making its real estate subject to taxation as such: Hestonville, Mantua and Fairmount Passenger Railroad Company *v.* Philadelphia, 8 Norris 210.

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

The alleged error in the mode of proceeding to make the assessments, was not so strongly pressed in the argument. We think the several Acts of Assembly justified the proceeding. The Act of 1859 subjecting this property to taxation declares: " all taxes levied in pursuance of this Act may be collected as debts of similar amounts are recoverable by law." The Acts of 22d March 1877, P. L. 16; 28th March 1872, P. L. 606, and 5th of May 1876, P. L. 124, appear to justify the mode of proceeding. We discover no error in the judgments.

Judgment affirmed in each case.

GREEN, J., filed the following dissenting opinion, in which PAXSON, J., concurred.

For more than half a century it has been the undoubted law of this Commonwealth that the works and structures of railroad and canal companies, which are essential to the exercise of the corporate franchise, are not taxable under the designation of " real estate," " houses," " lands," " lots of ground." Thus in Lehigh Coal & Nav. Co. *v.* Northampton Co., 8 W. & S. 334, decided in 1845, it was held that the bed, berme-bank and tow-path of an incorporated canal are not taxable as land or real estate under the Acts of 15th April 1834 and 29th April 1844, nor are the toll-houses and collectors' offices belonging to the canal and incident thereto. The express words of the Act of 1834 declared that, " real estate, viz: All houses, lands, lots of ground," &c., &c., should be subject to taxation. The Act of 1844, § 32, declared that " all real estate, to wit: houses, lands, lots of ground. . . and all other real estate not exempt by law from taxation," should be assessed and subject to taxation for all state and county purposes. In considering the application of this language in the case above cited, KENNEDY, J., on p. 337 said: " But if the lock-houses and collectors' offices attached to the canal belonging to the plaintiffs in error, are to be considered as constituent parts of the canal, or necessarily incident thereto, it will be very difficult, if not impossible, fairly to show that they are embraced within the list of enumerated articles above. If the lock-houses and collectors' offices be necessarily incident to the canal, of which I think there is no doubt, they cannot well be considered as either lands, houses, or lots of ground, according to the true meaning of the Acts recited, and a fair interpretation thereof."

The same doctrine was applied in Navigation Co. *v.* Commissioners, 1 Jones 202, to the case of a toll-house which was also occupied as a residence by the collector. ROGERS, J., on p. 204, in speaking of the house and this use of it, said, " It is nevertheless a constituent part of the canal, necessarily incident thereto, within the meaning of the decisions already cited."

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

On p. 205 he says, "No person was ever so absurd as to suppose that a canal passing through several counties was the subject of taxation for county purposes. This was conceded, and as the canal itself was not liable to assessment as a whole, it was thought that a component part came within the same category ; that the incident followed the principal ; that part was of the same nature with the whole. Besides, that there was no design to tax canals under the general denomination of lands, houses, and other real estate, also appears from this : that they are not classed as real estate, but are treated by the legislature as a species of personal property. They are not taxed as real estate, but their corporate franchise, the canal itself or the dividends, are taxed, or may be, by the Commonwealth, and moreover, the dividends of the respective shareholders, may, in the shape of income, be again taxed, not only for state but county purposes."

In Railroad *v.* Berks Co., 6 Barr 70, the distinction was more definitely taken between such buildings and works as are necessary, and such as are only convenient, to the exercise of the franchise, holding that the former are to be regarded as a part of the franchise or principal structure, while the latter retain their character as real estate in the proper sense of that term. Water stations, depots, offices, oil houses, places to hold cars, and such buildings and places as may fairly be deemed necessary and indispensable to the construction of the road, were held to be free from taxation as "real estate," or "houses" or "lands," for the reasons given in the previous decisions.

In Railroad *v.* Sabin, 2 Cas. 242, we held that the machine-shops, foundries, freight and passenger houses of a railroad company, were not subject to taxation under the Acts of 1834 and 1844, because they were used to carry on the business of the company, and the expense of their erection was charged to the cost of construction, and represented, in part, the stock which was subjected to taxation. In West Chester Gas Co. *v.* Chester County, 6 Cas. 232, the doctrine was extended to the necessary works of a gas company. This decision was followed in Coatesville Gas Co. *v.* County of Chester, 1 Out. 476, as to the lot and buildings erected thereon for the necessary purposes of the company. On page 481, the present chief justice, delivering the opinion of the court, said : "As we have already shown, this lot constitutes a part of the stock of the corporation which already pays a tax thereon to the commonwealth, and the owners of the stock pay taxes thereon to the county." After reviewing the leading cases, he says : "The principle which appears to be recognized, is, that the public works of a corporation, used as such, with their necessary appurtenances, shall be exempt from taxation as land, but be subject to it in

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

another form, and that a gas company so far partakes of the nature of a corporation for public purposes as to be subject to the same rule."

The practical meaning of this proposition is that the indispensable works of a public corporation are a part of its corporate franchise, and therefore taxable as stock, which is personal property, and hence can not be regarded as real estate in any form. This is the express ground upon which the whole doctrine is based in the opinion of this court in the case of Northampton County *v.* Lehigh Coal & Nav. Co., 25 P. F. S. 461. It was there held that neither the Act of April 8th 1873, repealing all laws exempting real estate from taxation, nor the Constitution of 1874, made any change in the course of judicial decisions upon the construction of the general laws. On p. 464 SHARSWOOD, J., says: "There is nothing in the provision that all taxes shall be uniform upon the same class of subjects, within the territorial limits of the authority levying the tax, which at all contravenes the general principle settled by the Supreme Court as to what is real estate within the classification of the tax laws, and that land, necessary to the franchise of a railroad corporation, is a part of such franchise, and not real estate subject to local taxation under the existing laws." In my judgment this is the only true ground upon which the decisions holding the indispensable structures of corporations of a public character to be free from taxation as real estate, can be rested. In point of fact the passenger station of a railroad company is a "house," and the ground upon which it is erected is "land," no matter what purposes they may be used for. But when they constitute part of a railroad, while they are still in fact a house and land or "real estate," they have in legal contemplation entered into, and become a part of the railroad itself, the whole of which is represented by the capital stock. This stock is the legal manifestation of the corporate franchise, which is the right to build, maintain and conduct a railroad. The indispensable structures therefore, have, by the character of their use, absolutely lost their quality of real estate, and are not at all defined or included in any Act of legislation which uses that term or mode of designation, only. In the entire course of the decisions of this court not a solitary case has been found in which this rule has been departed from. With absolute and unbroken uniformity, we have always held that this class of structures is not taxable even under Acts which make *all* real estate, and *all* houses, lands, and lots of ground, subjects of taxation. It must certainly be conceded that the generality of this mode of designation permits no distinction as to the use or ownership of the real estate, the houses, the lands or lots of ground, which are declared to be subjects of

8 OUTERBRIDGE—35

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

taxation by the supreme taxing power. Not a fragment of utterance can be found in the Acts of 1799, 1834 or 1844, in the least degree indicative of a legislative intent that "real estate," "houses," "lands," or "lots of ground," if they belong to a railroad company and are indispensable to its use are not to be taxed. The reason why they can not be taxed under those Acts, is because they are personal estate, and therefore not included within the enumeration of taxable subjects. Now this rule which declares such structures to be personal estate is no part of the statutory law of the state. It is the law altogether outside and independently of any statute. It has become the law by the decisions of this court, and will remain the law, after the decision of the present case, as it has always been before. It is not founded upon any idea of a legislative intent to exempt, but upon a totally different and independent idea, to wit, that the property in question is not in fact—that is, in legal fact— real estate or houses or lands, but personal estate, corporate franchise.

In the present case it is proposed to disregard this law. The subjects of taxation are all of them structures which are indispensable to the exercise of the corporate franchise, and therefore personal property. The legislation which, it is claimed, subjects this personal property to taxation is the third section of the Act of January 4th 1859, P. L. 828, authorizing the city of Pittsburgh to raise additional revenue. It is in the following words:

"Section 3. That all real estate situated in said city owned or possessed by any railroad company, shall be and is, hereby made subject to taxation for city purposes the same as other real estate in said city."

It will certainly not be claimed that there is the slightest attempt here to change the general law of the state, that the necessary works of railroad companies are personal estate. It can not be claimed that there is any declaration that for the purposes of this Act, the necessary works of railroad companies within the city of Pittsburgh shall be treated as real estate. There is no provision that such works of those companies shall be taxable. There is no ambiguity in the language of the Act. It means just what it says: that the real estate of railroad companies within the city is to be taxed for city purposes. Whatever real estate such companies possess within the limits designated, is taxable under the act. The terms of the Act are fully satisfied, and apparently there is nothing to be determined by construction or interpretation. Yet it is perfectly manifest that if the works and structures in question are to be taxed at all, it can only be done by construction. Considered affirmatively, and by force of its plain words, there is not the slightest

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

expression in the section of any intent to tax personal estate, or to change the law of the state which declares these works and structures to be personal estate, or to declare that law suspended as to the property of railroad companies in the city of Pittsburgh. How then are these structures to be made taxable under this Act? It was decided by the court below, and is contended on behalf of the city, that unless this Act is held to apply to the works in question it is useless and meaningless, because the real estate of the city is taxable for city purposes by other laws, and under those laws the real estate of the railroad companies is taxable independently of this Act. In order then to give meaning and effect to the Act, it is proposed to extend it to the works and structures in question, in contravention of the existing and undoubted law of the state which holds them to be personal property only, and as such untaxable as real estate.

I do not regard the argument as of any serious moment, which would by sheer force, confer a meaning by construction, upon the unmeaning or unintelligible words of a statute. If upon the literal and legal reading of the words employed they are incapable of application or enforcement, the Act simply falls. It is incapable of execution, and of this there are many examples in the books. A notable instance of this kind occurred in the case of the Commonwealth *v.* Bank of Pennsylvania, 3 W. & S. 173, in which this court refused to enforce an Act of Assembly and supplement thereto, relating to the election of assignees of the Bank of Pennsylvania, for the express reason that the meaning of the Act was so uncertain that it could not be determined to the satisfaction of the court.

It has been repeatedly held that if the plain words of a statute lead to an absurd result that is not a sufficient reason for changing the natural interpretation of the word employed. Thus in Abley *v.* Dale, 11 C. B. 378, the chief justice, on p. 391, says, "If the precise words used are plain and unambiguous in our judgment, we are bound to construe them in their ordinary sense, even though it lead in our view of the case to an absurdity or manifest injustice. Words may be modified or varied where their import is doubtful or obscure. But we assume the functions of legislators when we depart from the ordinary meaning of the precise words used, merely because we see, or fancy we see, an absurdity or manifest injustice from an adherence to their literal meaning." In Woodward *v.* Watts, 2 Ell. & Black. 452; CROMPTON, J., said, "I do not understand the rule of construction to go so far as to authorize us, where the legislature have enacted something which leads to an absurdity, to repeal that enactment and make another for them, if there are no words to express that intention." In Green *v.*

Wood, 7 Q. B. 178, Lord DENMAN, C. J., said, " We are bound to give to the words of the legislature all possible meaning which is consistent with the clear language used. But if we find language used which is incapable of a meaning we cannot supply one. It is true that we have here words which, as they stand, are useless ; a circumstance, perhaps, not altogether unprecedented. But, to give an effectual meaning, we must alter not only, " or " into. " and," but " issued " into " levied." It is extremely probable that this would express what the legislature meant. But we can not supply it. Those who used the words thought that they had effected the purpose intended. But we, looking at the words as judges, are no more justified in introducing that meaning than we should be if we added any other provision. We can do no more than give such a meaning as the words authorize." In the case of Frye *v.* Chicago, &c. R. R. Co., 73 Ill. 399, it was held that although, where the object of the legislature is plain, and the words of the Act unequivocal, courts ought to adopt such a construction as will best effectuate the intention of the legislature, yet it is a well settled rule of construction that they must not, even in order to give effect to what they may suppose to be the intention of the legislature, put upon the provision of a statute a construction not supported by the words, even though the consequences should be to defeat the object of the Act.

But there is a still more serious objection to the argument we are considering, and that is, that the assumption upon which it is based is not true in fact. The act upon its plain reading is neither meaningless nor absurd. It means that the real estate of railroad companies in the city of Pittsburgh is taxable for city purposes. That meaning we are compelled to respect and to enforce. If there is prior legislation to that effect we must nevertheless give to this Act the same effect. If such prior legislation should be repealed, this remains, and we can not refuse to enforce it in its literal sense, without repealing it, which of course we can not do. The utmost, therefore, that can be said of the Act in question, is that it is superfluous. It is very certain, however, that mere superfluity of legislation is no objection either to its validity or its effective operation. It is not at all uncommon to discover different legislative enactments in relation to the same subject, but surely it was never considered that the redundancy of legislative action thus ascertained, constituted any reason for denying its actual operation, or for changing its plain meaning.

In the Act under consideration the words " real estate" are the only words which designate the subject of taxation, and it is the real estate of railroad companies only which is directed to be taxed. These words, when applied to the property of railroad

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

companies, have received a fixed definite meaning by the repeated decisions of this court. They do mean and include real estate in its ordinary acceptation, and hence they are clearly applicable to all the real estate of railroad companies. But we have declared that certain structures and works which are necessary to the use of railroads, are not real estate, though but for that use they would be. This meaning is the legal meaning, and therfore the actual, real meaning of the legislature when legislating for the taxation of the property of railroad companies. It is of course competent for that body to say, that the words " real estate " shall not have that meaning in a given case, but in this case they have done nothing of the kind, and hence their fixed, legal meaning should prevail.

But let us consider the argument by which the contention of the city in the present case is sustained. It is thus stated in the paper book of the very able counsel for the city: "The legislature of 1859 knew of the decisions in the Permanent Bridge case and in the Lehigh Coal and Navigation Company case. They knew that merely subjecting land or real estate to taxation within the county or city did not thereby enable the county or city to tax the real estate occupied by (the) corporation with its necessary works. Therefore, in the Act of 1859, in so many words they said that the real estate either owned or possessed by a railroad company, should be therefore (thereafter?) subjected to municipal taxation, the same as other real estate owned by individuals." This is probably the strongest and most ingenious presentment, in support of the construction contended for by the city, that the subject will admit of. It refers the meaning of the Act to the conscious, or supposed conscious, intelligence of the members of the legislature which passed it. Yet what is the true character of this argument? In very terms it affirms that the legislature knew the existing state of the law, knew that if they simply declared that the " real estate " of railroad corporations should be taxed, the " necessary works" would not become subject to taxation. Yet, notwithstanding this knowledge, they deliberately, consciously and intelligently chose those very words in designating what property should be taxed. The learned counsel for the city conclude from this premise that the legislature meant that all the real estate of railroad companies, including the indispensable structures, should be taxed. To my mind precisely the opposite inference is the only one that can be drawn. If the legislature knew that the words used had a defined and restricted meaning, which excluded the structures in question from taxation, how is it possible to resist the conclusion that if they used them at all they used them in that sense? To hold the contrary is to hold that the members of the legislature vio-

lated their duty and their official oaths, that they deliberately used words which they knew had a certain fixed, definite and restricted meaning, when they intended that the words should have an entirely different and opposite meaning.    We have no right to impute such conduct, or the motive or purpose which would prompt it, to a co-ordinate branch of the government; and if we had the right, we ought not, in the interest of public morals and policy, to exercise it.    If this legislature knew that by using only the words "real estate," in the Act designating the subjects of taxation, the indispensable structures of railroad companies would not become subject to taxation, then if they really intended such structures to be taxed, they should, and necessarily would, have said so in unmistakable language. It was a perfectly simple and easy matter to do so, either by naming the structures, such as passenger stations, freight houses, engine houses, offices, water stations, &c., or by using general language with an express declaration that it was intended to include all the works and structures of the companies, whether used for the purposes of the roads or not.    Not having done so, and having used only words which have received a fixed, definite, legal meaning by the repeated decisions of this court, we are bound to infer they intended to use them in that sense.

It is argued with much earnestness that because the real estate of railroad companies, as distinguished from all other real estate, was made taxable by this Act, therefore we must infer, that the necessary works and structures were intended to be included.    When it is considered that the general Acts of 1834 and 1844 made taxable all real estate, and all houses, lands and lots of ground, without any distinction of ownership or use, this argument loses much of its force, because those Acts were quite as applicable to the real estate, houses, lands and lots of railroad companies, as to those of other corporations or individuals.    But the argument is definitely met and answered by a decision of this court which has never been doubted or overruled, in which the ownership of the property subject to taxation was much more limited than in the present case. In the case of Wayne Co. *v.* Del. & Hudson Canal Co., 3 Harr. 351, the Act of April 1st 1825, P. L. 141, which authorized the company to improve the navigation of the river Lacka-waxen, provided in the fifth section, "That the property of the said company, whether real or personal, within this state, shall at all times be liable for its debts, and subject to taxation, in like manner as similar property held by an individual or corporation, now is or may be."    It was held by this court that the reservoirs created by the company for supplying the canal with water, the houses and gardens occupied by the lock-tenders and collectors along the canal and railroad, the engines

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

and machinery for raising cars up the planes, and the engine-houses, the houses and gardens occupied by the engineers attending the engines, and the collector's and engineer's office in Honesdale were not subject to taxation for state or county purposes. The point was made by counsel for the county, on the argument in this court, that the Act in question expressly made taxable the real and personal estate of this particular corporation in like manner as the same kind of property held by an individual or corporation. But this court, and also the court below, held that the works and buildings above mentioned were not taxable, and adhered to the general doctrine expressed in the cases heretofore cited. It seems to me this case is a complete answer to the entire argument on behalf of the city in the present case, so far as mere authority is concerned, and that consistency requires that we should either overrule it or stand by it and give it application to the present contention. It seems to me also that the case of Northampton Co. *v.* Lehigh Coal & Nav. Co., above cited, is equally imperative and controlling in the same direction. There the very purpose of the Act in question (Act of April 8th 1873, § 1, P. L. 64), was to repeal all laws exempting real estate from taxation, and the express words of the Act were : " That all real estate within this Commonwealth shall be liable to taxation for all such purposes as now is, or hereafter may be, provided by general laws, excepting only therefrom the classes of property specifically exempted from taxation," by certain Acts relating to places of worship, burial grounds, &c., &c. When a special exception was inserted in this Act which did not include railroad or canal companies, it might well be argued that the intention of the legislature, as well as the words of the Act, subjected all other real estate within the Commonwealth to taxation, without any regard to its ownership or use. But we then thought differently, and held to the course of all the previous decisions, that the term " real estate " did not include the necessary works and structures of a railroad company because they were not real estate but a part of the corporate franchise.

I can not help thinking that a due respect to the dignity of this tribunal, to the consistency of our own decisions, to the stability of legal principles, requires that we should adhere to the construction we have always given to the identical words we are now considering, and to hold that the works proposed to be taxed in the present proceedings are not taxable because they are not real estate, and, therefore, do not come within the operation of the Act in question. If they are taxable it will necessarily follow that all of the track, and the land upon which it is laid, within the limits of the city of Pittsburgh, will be subject to taxation, and therefore, to seizure and sale. As such

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

a result is entirely at war with all settled principles and doctrines relating to this class of property, I cannot assent to a decision which leads necessarily and directly thereto.

I am equally unable to follow the devious path of a supposed legislative intent, which may or may not exist, according to the higher or lower grade of intelligence or of personal integrity of individual members of a legislative body; especially as it is quite possible to understand, that many members may have been willing that such a bill should pass, for the very reason that they regarded it as unavailing to change the existing law, and subject indispensable structures of railroad companies to taxation.

The vice of the argument from intention in this particular case is, that the evidence of the supposed intention is not found in the words of the Act but in facts and considerations outside of it. Thus it is argued that the real estate of the city of Pittsburgh is subject to taxation by other law, and therefore an intent must be inferred to tax the necessary structures. The existence of such other legislation is a fact entirely outside of the present Act. We must take cognizance of that legislation, of its terms and its import, before we can proceed with the argument founded upon its meaning and effect, as affecting the supposed intent in the present legislation. We are not referred, either by the findings of the court below, or by the arguments of counsel on either side, to the legislation which imposes taxation for city purposes upon real estate within the limits of the city of Pittsburgh. Whether it is the general law of the state alone, or whether it is composed in part of local statutes affecting the city, or the county of Allegheny, we are not informed. But it is sufficient to know that it is not contained in the Act we are considering, and must be ascertained by an examination of Acts altogether foreign to, and independent of it. Now as I understand the law upon this subject this can not be done; in other words, construing an Act upon the theory of a supposed intention, the evidence of the intention must be found in the language of the Act and not outside of it.

In the case of Schooner Paulina's cargo *v.* The United States, 7 Cranch 52, Ch. J. MARSHALL says: "In construing these laws, it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words which the legislature has employed to convey it." . . . "But should this court conjecture that some other Act, not expressly forbidden, and which is in itself the mere exercise of that power over property which all men possess, might also be a preliminary step to a violation of the law, and ought therefore to be punished for the purpose of effecting the legislative intention, it would certainly trans-

cend its own duties and powers, and would create a rule instead of applying one already made."

In the case of Rex *v.* Stoke Damerel, 7 Barn. & Cress. 563, BAYLEY, J., says : "I do not know how to get rid of the words of this section of the Act of Parliament, and where the legislature, in a very modern Act of Parliament have used words of a plain and definite import, it is very dangerous to put upon them a construction, the effect of which will be to hold that the legislature did not mean that which they have expressed."

In Rex *v.* Poor Law Commissioners, 6 Ad. & Ell. 1, COLERIDGE, J., says, "It is in my opinion so important for the court in construing modern statutes, to act upon the principle of giving full effect to their language, and of declining to mould that language in order to meet either an alleged convenience, or an alleged equity, upon doubtful evidence of intention, that nothing will induce me to withdraw a case from the operation of a section which is within its words but clear and unambiguous evidence that so to do is to fulfill the general intent of the statute, and also that to adhere to the literal interpretation is to decide inconsistently with other and overruling provisions of the same statute."

In Everett *v.* Wells, 2 Scott N. C. 531, TINDALL, C. J., says, "It is the duty of all courts to confine themselves to the words of the legislature, nothing adding thereto, nothing diminishing."

In Potter's Dwarris on Statutes, p. 146, one of the rules of interpretation is thus stated : "20. In the enactment of statutes the rule of interpretation is, in respect to the intention of the legislature, that where the language is explicit, the courts are bound to seek for the intention in the words of the Act itself, and they are not at liberty to suppose or to hold, that the legislature intended anything different from what their language imports :" citing Supervisors of Niagara *v.* The People, 7 Hill 513.

In Priestman *v.* United States, 4 Dall. 28, CHASE, J., said, on p. 30, n. 1, "By the rules which are laid down in England for the construction of statutes, and the latitude which has been indulged in their application, the British judges have assumed a legislative power, and on the pretence of judicial exposition, have in fact made a great portion of the statute law of the kingdom. Of those rules of construction, none can be more dangerous than that, which, distinguishing between the intent and the words of the legislature, declares that a case not within the meaning of a statute according to the opinion of the judges, shall not be embraced within the operation of the statute, although it is clearly within the words ; or, vice versa, that a case within the meaning, though not within the words,

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

shall be embraced. For my part, however, sitting in an American court, I shall always deem it a duty to conform to the expressions of the legislature, to the letter of the statute when free from ambiguity and doubt, without indulging a speculation, either upon the impolicy or the hardship of the law."

In Sedgwick on the Construction of Statutory and Constitutional Law, on page 205, the writer concentrates an exhaustive consideration of the subject thus : " But in modern societies, where the division of political attributes is so much more nice and rigorous, where the business of legislation has become multifarious and enormous, and especially in this country, where the judiciary is so completely separated from the legislature, it must be untrue in fact that they can have any personal knowledge, sufficient really to instruct them as to the legislative intention ; and if untrue in fact, any general theory or loose idea of this kind must be dangerous in practice. I believe that, subject to the rules hereafter declared, and subject to the exceptions of equitable construction, to be discussed in the next chapter, the tendency of all our modern decisions is to the effect, that the intention of the legislature is to be found in the statute itself, and that there only the judges are to look for the mischiefs meant to be obviated, and the remedy meant to be provided."

It is not necessary to prolong citations of this class of authorities ; they are very numerous.

It cannot be argued that the words " real estate" in the Act in question have an ordinary meaning which would include the necessary works of railroad corporations, because those words have received a judicial construction which fixes and establishes their meaning, excluding those works, on the ground that they are not real estate. This consideration brings into operation another rule of construction which seems equally decisive of the present contention. In Potter's Dwarris on Statutes, page 274, it is thus expressed: " Words and phrases, the meaning of which in a statute has been ascertained, are, when used in a subsequent statute, to be understood in the same sense." In note 4, at the foot of the same page, the rule is more fully expressed and accompanied with authorities, thus : " Where the terms of a statute which has received judicial construction, are used in a later statute, whether passed by the legislature of the same state or country, or by that of another, that construction is to be given to the later statute : Commonwealth *v.* Hartwell, 3 Gray 450 ; Ruchmaboye *v.* Mottichmed, 32 Eng. L. & Eq. 84 ; Bogardus *v.* Trinity Church, 4 Sandf. Ch. 633 ; Rigg *v.* Wilton, 13 Ill. 15 ; Adams *v.* Field, 21 Vt. 256. It is to be presumed in such cases, that the legislature who passed the later statute knew the judicial construction which had been placed

[Pennsylvania R. R. Co. *v.* Pittsburgh.]

on the former ones, and such construction becomes a part of the law."

Where a statute is enacted substantially the same as a previous one which has received judicial construction, the legislature will be presumed to have known that construction, and to have intended to adopt it: O'Byrnes *v.* State, 51 Ala. 25; Cota *v.* Ross, 66 Me. 161.

Applying this principle to the present case, it is apparent that the legislature must be presumed to have used the words "real estate" according to their fixed legal meaning. It follows that there is no ambiguity in the words of the Act, and it must therefore be read in conformity to the rule stated by Mr. Justice THOMPSON in Bradbury *v.* Wagenhorst, 4 P. F. S. on p. 182, to wit: "Whatever may have been the legislative thought, no ambiguity exists in what they have said, and where the words of a statute are plainly expressive of an intent the interpretation must be in accordance therewith."

There can be no question that the words employed in this Act are clearly expressive of an intent to tax real estate, for that is the positive language used. There are no words indicating an intent to tax personal estate, and therefore there is no ambiguity to be explained.

When we come to declare what was the intention of the legislature which passed this Act, we enter at once upon a sea of conjecture. If we say they must have intended to tax the necessary works of the companies, we assert for them an intent which they did not assert for themselves. Of course we can only do this upon the theory that they really designed, had the mental purpose, to tax such works. But by what authority can we say this? We know nothing of them as individuals, we can not possibly know anything about their mental purposes. We know nothing of their personal integrity, nothing of their intelligence. Suppose the Act was drawn by a crafty and designing person in the interest of the railroad companies, who used this language because he knew that the words "real estate" would not include the necessary works of the companies? Or suppose certain members, in sufficient numbers to constitute a majority, voted for it, for the same reason, and in the same interest? Either or both of these suppositions are entirely in accord with actual experience in the business of legislation, and yet either of them, would, if true, utterly destroy the argument from intention. Who shall say they are not true in this case, or, by what authority shall we so declare? Or suppose that either the draftsman of the Act, or the members who voted for the bill, or all the members, entertained the belief that the real estate of railroad companies was free from taxation, and sought to make it taxable in the city of Pittsburgh by this Act? In that event

the words " real estate " would have their proper legal signifi-
cation, they would include all real property which was merely
convenient, and exclude such as was essential to the exercise
of the corporate franchise. This was precisely the case with
the general laws of 1799, 1834 and 1844. If the legislature
which passed this Act was entirely ignorant of the distinction
between works of convenience and works of necessity, then of
course it cannot be said that they had any specific intent to tax
works of necessity, because they knew nothing about them.
Lastly, if they did know of the distinction, and therefore
knew the necessity of using apt words in order to tax the indis-
pensable structures, and nevertheless did not use those words,
then we are bound to presume that they did not intend to tax
the structures. The legal presumption is that they did know
the existing state of the law, and that they passed the Act in
question with that knowledge. The learned counsel for the
city, understanding this perfectly, have rested their case upon
this theory. It is the only theory upon which it can be rested,
but it is, in my judgment, entirely inadequate to the purpose
for which it is invoked. For it necessarily presupposes the
presence of a knowledge which would compel the use of words
which do not appear, and the omission or carefully defined use
of words which do appear in the Act in question. Hence we
cannot by mere inference assert an intent, which the legislature,
knowing the necessity of its assertion, failed entirely to express.

There is a curious circumstance in the work of the legisla-
ture of 1858, which strongly illustrates the danger of conjectur-
ing an intent upon considerations which are outside of an Act
in question. It happens that this same legislature passed an
Act which was approved on April 21st 1858, and is found on
p. 385 of the Pamphlet Laws of that year. It is a supplement
to the Act incorporating the city of Philadelphia, and its pur-
pose is expressed in the preamble, thus:

" Whereas, the burden of taxation for the support of the
government of the said city is now mainly borne by the owners
of real estate therein, and it is just that the owners of personal
property should contribute thereto: therefore,

" Section 1. Be it enacted by the senate and house of repre-
sentatives, &c., that the offices, depots, car houses and other
real property of railroad corporations situated in said city, the
superstructure of the road and water stations only excepted,
are and hereafter shall be subject to taxation by ordinances for
city purposes."

No other section of the Act imposes any taxation upon any
property, and all but one relate to other subjects than taxation.
It is apparent, therefore, that this legislature, when they really
intended to tax the necessary works of railroad companies,

expressly named the structures, and added general words which included all real estate used for such purposes, excepting specially, the superstructure of the roads and the water stations. But what is of still more consequence, they expressly declared that this was done for the purpose of taxing personal property, in ease of the owners of real estate.. In other words, they asserted a purpose to tax personal estate only, and as an exercise of that purpose they taxed the necessary structures of railroad companies only. The conclusion is irresistible that this legislature knew that the necessary works of railroad companies were personal estate, and also that in order to make them taxable they must be expressly named. The inference, therefore, seems conclusive that when they passed the Act we are considering, and only named " real estate" in it, they did not intend to tax the structures.

On this question of intention outside the words of the Act there is another circumstance of the greatest significance. The Act was approved the 4th of January 1859, which was one day before the legislature of that year assembled. It was really passed by the legislature of 1858, on April 15th, and as the legislative record of that session shows, it was reported, considered and passed as a private bill, and without a word of debate. The express purpose of the Act was to enable the city of Pittsburgh to raise additional revenue by taxation. Onerous taxation was imposed by the other sections. Yet it is conceded that in all the time from the passage of the Act, down to the present proceeding, twenty-two years, no attempt was made by the city to tax the necessary works and structures of the railroad companies. Why is this? Certainly the persons who procured the passage of the Act knew what their own purpose was in obtaining its enactment. It must be assumed the money was needed which would be derived from the enforcement of the Act, and that the city authorities would use all the agencies which the Act afforded. Acting upon this theory they would at once and continuously thereafter have proceeded to assess and tax the structures in question. But they never did, and the only reason that can be assigned for this omission is that it was not supposed that the structures were taxable under the Act. Had the persons who obtained the passage of the Act believed the necessary works were taxable, they would at least have made the attempt to have them taxed, and would have appealed to the courts for that purpose, by proper proceedings. The fact that no such attempt was made for more than twenty years after the passage of the Act in question, affords a most persuasive inference that it was not expected, and therefore was not intended by the Act to subject the necessary works of railroad companies within the city

limits, to taxation for city purposes. Contemporaneous construction and usage are regarded as valuable aids in the interpretation of statutes of doubtful meaning: Sedgwick on Construction of Statutory and Constitutional Law, p. 212, 215 et seq. The force of this consideration is greater in the present than in ordinary cases, because the city is practically asking us to reverse her own construction of the Act in question, continued for many years, when it was constantly her highest pecuniary interest to have asserted the rights which she now claims under the Act.

The legal rule upon this subject is expressed in the maxim *contemporanea expositio est fortissima in lege :* Potter's Dwarris on Stat. 184 ; Phila. & Erie R. R. Co. *v.* Catawissa R. R. Co., 3 P. F. S. 61. In Stuart *v.* Laird, 1 Cranch 299, the court said : " To this objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, afford an irresistible answer, and have indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest and ought not now to be disturbed." In Rogers *v.* Goodwin, 2 Mass. 475, the court, speaking of a long usage under an old Act, says : " The legal ground on which this provision is now supported is, that long and continued usage furnishes a contemporaneous construction which must prevail over the mere technical import of the words."

In Packard *v.* Richardson, 17 Mass. 143, Ch. J. PARKER says, " A contemporaneous, is generally the best construction of a statute. It gives the sense of a community of the terms made use of by a legislature."

To give to this Act the effect that is sought, we must either strike out the words " real estate," as useless, and insert in their place the words, " passenger stations, freight stations, freight houses, offices, engine houses, car houses, machine shops, and all other works and structures :" or if the words " real estate : are left in, we must add to them, words to the following effect" " including all passenger stations, freight stations, freight houses," &c., as above, or to this effect : " and for the purposes of this Act all the necessary works and structures of said companies, used in conducting the business thereof shall be deemed and taken as real estate." Of course we have no right to take such liberties with any legislation, and the mere statement, in words, of what it is that we are asked to do, in order to affirm the judgment in this case, is, in my opinion a conclusive reason for its reversal.

I am authorized to say that my brother PAXSON concurs with me in this opinion.